## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

KINGSBURY, INC,                          :
Plaintiff,                               :
                                         :          CIVIL ACTION
        v.                               :          NO. 14-3742
                                         :
GE POWER CONVERSION UK,                  :
LIMITED                                  :
        Defendant.                       :


**December _24__, 2014**                                    **Anita B. Brody, J.**

### <u>MEMORANDUM</u>

This action arises out of the construction of a motor for a nuclear reactor that Defendant

GE Power Conversion UK, Limited ("GE") was building in South Korea.  Plaintiff Kingsbury,

Inc. ("Kingsbury") contracted with GE to design, manufacture, and install the bearings for the

motor.  During construction of the nuclear reactor, the motor experienced a catastrophic failure.

Kingsbury brings suit against GE seeking a declaratory judgment that it is not responsible for the

catastrophic failure of the motor and alleging four counts of breach of contract.[1]  I exercise

diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.  GE moves to dismiss four

counts of the Complaint, and to stay and compel arbitration of the fifth count.  For the reasons

set forth below, I will grant in part and deny in part GE's motion.

## I.  BACKGROUND

In August 2010, GE sent Kingsbury and other companies a Request for Tender for the

supply of a top bearing and a bottom bearing to be used in the construction of a motor for a

nuclear reactor that GE was building for the KSTAR project in South Korea.  Compl. ¶ 12;

Def.'s Mot. Ex. 1.  The Request for Tender invited companies to submit proposals for the design

---

[1]  Although Kingsbury initially brought suit against GE Power Conversion USA, Inc. and GE Power
Conversion International, they are now dismissed from the action.

and manufacture of these bearings in conformance with Version B of GE's specifications for the bearings that were attached to the request.  Def.'s Mot. Ex. 1 ¶ 1.  The Request for Tender stated that it was "not an offer to purchase any goods or services."  *Id*.  The Request for Tender also included the "Coverteam's Conditions of Purchase," and stated that to "win the business" any buyer would have to comply with the terms of both.  *Id.*  Coverteam's Conditions of Purchase defined the "Contract" as "the contract between the Buyer and Seller consisting of the Purchase Order, any documents referred to in the Purchase Order and these Conditions of Purchase."  *Id.*  Coverteam's Conditions of Purchase also specified liquidated damages at 2% of the contract price per week of delay up to a maximum of 8% of the contract price.  *Id.*

On December 9, 2010, after several months of discussions between the parties, Kingsbury sent GE "Quotation # E103184-4."  Compl. ¶ 13, Ex. A.  The top portion of every page of the quotation included the statement, "Kingsbury is pleased to offer the following in reference to your recent inquiry."  Compl. Ex. A.  The quotation described plans for the design, manufacture, and testing of the two bearings in conformance with Version B of GE's specifications for the bearings.  *Id.*  It listed a "preliminary design & production schedule" for the bearings.  *Id.*  Additionally, the quotation set forth an itemized price quote for the engineering design services; supply of a top bearing, a bottom bearing and other components related to those bearings; and estimated shipping costs.  *Id.*  Kingsbury, however, did not guarantee the prices or delivery dates it quoted.  *Id.*  As Kingsbury explained in the quotation:

> These prices & lead times are valid for acceptance for 6 days and are subject to the final design of the brake.  Since the brake is undefined at the time that this proposal was prepared, Kingsbury reserves the right to adjust the pricing and lead time based on the final design configuration of the brake or its interface with the bearing housings.

*Id.* The quotation concluded with the statement, "Please review this at your convenience and let me know if you have any questions." *Id.* The price quotation did not contain a liquidated damages provision. *Id.*

Over the course of the next month, the parties engaged in further negotiations regarding GE's purchase of bearings from Kingsbury. On December 13, 2010, the parties exchanged emails about the quotation and GE's insistence on the inclusion of a liquidated damages provision. Def.'s Mot. Ex. 2. GE reminded Kingsbury that in an earlier statement it had already offered a liquidated damages provision of 0.5% of the contract price per week up to maximum of 3% of the contract price. *Id.* GE countered by requesting a liquidated damages provision of 0.5% up to 5% of the contract price for delay. *Id.* Kingsbury responded, "Obviously Kingsbury would prefer to have no [liquidated damages], however, we will agree to 0.5% per week up to a total of 4% of the bearing assembly price if [GE] agrees to the following dates (as shown on the latest revision of the quote.)" *Id.*

On December 14, 2010, GE informed Kingsbury that it had decided to adopt a new version of the specifications for the bearings. Before it released Version C of the bearings, GE sent Kingsbury a copy of the proposed specifications and invited Kingsbury to send "any questions or comments you may have on the attached specification." Def.'s Mot. Ex. 3. On January 10, 2011, Kingsbury responded with a "list of questions, exception and comments," and stated, "I hope this meets with your approval. However, if there are any questions, please feel free to contact [us] at your convenience." *Id.*

On December 17, 2010, while Kingsbury was still reviewing the Version C specifications, GE sent Purchase Order 42047591 to cover the engineering design work for the top and bottom bearings. Compl. Ex. C. On January 11, 2011, GE sent two additional purchase

orders:  Purchase Order 190891 for the purchase of the bottom bearing and Purchase Order

190894 for the purchase of the top bearing.[2]  *Id.* Exs. D, E.  Both purchase orders for the supply

of the bearings set a firm shipment date for the bearings and contained a liquidated damages

provision of 0.5% of the contract price per week of delay up to a maximum of 4% of the contract

price.  *Id.*  Additionally, both purchase orders for the supply of the bearings stated, "This

Bearing Assembly is to be designed, manufactured and tested in accordance with KSTAR

Bearing Specification [Version] C."  *Id.*  All three purchase orders referred to "quotation ref:

E103184-4."  *Id.*  The purchase orders established firm prices for the design work, manufacture,

and supply of the bearings.  *Id.*  Moreover, all three purchase orders were made subject to

Coverteam's Conditions of Purchase.  *Id.*  Coverteam's Conditions of Purchase included the

following forum selection provision: "The Contract shall be governed by and construed in

accordance with the Laws of England and shall be subject to the exclusive jurisdiction of the

English Courts."  Def.'s Mot. Ex. 1 ¶ 24.  In response to the purchase orders, Kingsbury sent

"Order Acknowledgements" to GE.[3]  Compl. ¶ 26, Ex. F; Pl.'s Resp. Ex. 2.  Despite their

agreement, GE never paid Kingsbury the $17,227.45 in shipping costs for the shipment of the

bearings to South Korea.  Compl. ¶ 59.

   Kingsbury shipped the bottom bearing to GE in South Korea in November 2011, and the

top bearing in January 2012.  Compl. ¶¶ 29, 30.  In August 2012, at GE's request, Kingsbury

performed field service and repair work for GE.  *Id.* ¶ 60.  On August 31, 2012, Kingsbury sent

---

[2] On October 11, 2011, GE sent Kingsbury Purchase Order 44071355, which served to amend Purchase Order 190891 by adding exact shipping costs.  Compl. ¶ 27, Ex. G.  Purchase Order 44071355 expressly provided that all other terms and requirements provided in Purchase Order 190891 "re[]main unaltered." *Id.*  Both parties agree that Purchase Order 190891 is essential to the determination of when the parties formed a contract and that Purchase Order 44071355 is immaterial.

[3] Although "Kingsbury cannot presently locate an Order Acknowledgment form for the top bearing purchase order," Kingsbury represents that "it is probable that such form was sent, consistent with Kingsbury's custom practice."  Pl.'s Resp. 8.

an invoice to GE in the amount of $43,272 for the field service and repair work.  *Id.* ¶ 60, Ex. J.
The invoice did not reference any purchase order.  *Id.* Ex. J.  GE never paid Kingsbury for this
work.  *Id.* ¶ 60.

As early as October 2012, it became apparent that the GE runner was incompatible with
the bottom bearing.  *Id.* ¶ 32.  On October 19, 2012, GE sent Kingsbury a Non-Conformance
Notice stating that the bottom bearing "was not fit for its purpose."  *Id.* ¶ 36.  In January 2013, at
GE's request, Kingsbury performed field service and repair work for GE.  *Id.* ¶ 61.  On January
31, 2013 Kingsbury sent an invoice to GE in the amount of $63,435.93 for the field service and
repair work.  *Id.* ¶ 61, Ex. K.  The invoice did not reference any purchase order.  *Id.* Ex. K.  GE
never paid Kingsbury for this work.  *Id.* ¶ 61.

On February 13, 2013, the motor for the nuclear reactor experienced a catastrophic
failure that resulted from contact between the bottom bearing and the runner.  *Id.* ¶ 37.  GE
selected a thrust bearing design specialist to investigate the cause of the motor failure.  *Id.* ¶ 40.
In March 2013, GE's specialist issued a report that concluded that Kingsbury's defective design
and manufacture caused the failure.  *Id.* ¶ 41.

On August 20, 2013, GE sent Kingsbury Purchase Order 44033885 requesting that
Kingsbury "perform labor for assembly and disassembly of new and reworked bearings" for
$130,000.  *Id.* ¶ 63, Ex. L.  In the purchase order, GE explained to Kingsbury:

> The price is based on your letter dated 14th August 2013 confirmed on your email
> dated 19th August 2013 of which the following is an extract[:]
>> ["]Our previous cost estimate can be considered the Fixed Price
>> cost for the Kingsbury scope of work.  Or summary assessment for
>> the reassembly work is 160 hours.["]

*Id.* Ex. L.  The purchase order also stated: "GE ENERGY STANDARD EUROPE TERMS OF PURCHASE REV. H (REVISED FEBRUARY 1, 2011) APPLY TO THIS ORDER."  *Id.*  The GE Energy Europe Terms of Purchase Rev. H provide:

> **DISPUTE RESOLUTION.**  In the event of any dispute arising out of or in connection with this Order, the parties agree to submit such dispute to settlement proceedings under the Alternative Dispute Resolution Rules (the "ADR Rules") of the International Chamber of Commerce ("ICC").  If the dispute has not been settled pursuant to the ADR Rules within forty-five (45) days following the filing of a request for ADR or within such other period as the parties may agree in writing, such dispute shall be finally settled under the Rules of Arbitration and Conciliation of the ICC (the "ICC Rules") by one or more arbitrators appointed in accordance with such ICC Rules.  The place of arbitration shall be London, England and proceedings shall be conducted in the English language, unless otherwise stated on the face of this Order.  The award shall be final and binding on both Buyer and Seller, and the parties hereby waive the right of appeal to any court for amendment or modification of the arbitrators' award.

Def.'s Mot. Ex. 4.  On September 27, 2013, Kingsbury sent an invoice to GE for $130,000 for the work outlined in Purchase Order 44033885.  Compl. Ex. M.  Kingsbury performed the requested services, but GE never paid Kingsbury for this work.  *Id.* ¶ 64, 65.

On January 24, 2014, GE sent a letter to Kingsbury stating that Kingsbury "had committed various breaches relating to the design and manufacture of the bearings," which caused GE to incur losses totaling 2,067,441 British pounds (or about $3.5 million).  *Id.* ¶ 50.  "In that letter, GE demanded that Kingsbury reimburse GE for those alleged costs promptly, and threatened to take legal action in the event Kingsbury did not do so."  *Id.* ¶ 51.

On February 3, 2014, Kingsbury commenced this action against GE.  In Count 1 of the Complaint, Kingsbury seeks a declaratory judgment that it is not liable for the catastrophic failure of the motor.  In Count 2, Kingsbury brings a breach of contract claim against GE for its failure to pay Kingsbury $17,227.45 in shipping costs incurred in connection with shipping the bearings.  In Count 3, Kingsbury brings a breach of contract claim against GE for its failure to

pay Kingsbury $43,272 for field service and repair work.  In Count 4, Kingsbury brings a breach of contract claim against GE for its failure to pay Kingsbury $63,435.93 for field service and repair work.  In Count 5, Kingsbury brings a breach of contract claim against GE for its failure to pay Kingsbury $130,000 for reassembly of the bearings.

## II.  DISCUSSION[4]

### A. Counts 1-4 of the Complaint

GE seeks dismissal of Counts 1-4 of the Complaint under the doctrine of *forum non conveniens* because it believes a forum selection clause mandates that these claims be brought in England.  Kingsbury opposes dismissal of Counts 1-4 based on the contention that no forum selection clause exists in any of the contracts related to these counts.

"[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*."  *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 580 (2013).  Both 28 U.S.C. § 1404(a) and the *forum non conveniens* doctrine "entail the same balancing-of-interests standard."  *Id.*  In a case without a forum selection clause, the moving party bears the burden of establishing the need for transfer.  *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995).  Moreover, in the absence of a forum selection clause, a district court considering a *forum non conveniens* motion must evaluate both the private and public interest factors,[5] *id.* at 581, and give "paramount

---

[4] **Both parties agreed on the record during a Rule 16 Conference that Pennsylvania law applies.**

[5] Private interests include:

> plaintiff's forum preference as manifested in the original choice; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

*Jumara*, 55 F.3d at 879 (citations omitted).  Public interests include:

consideration" to the plaintiff's choice of forum.  *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970).

"The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'"  *Atl. Marine*, 134 S. Ct. at 581 (quoting *Stewart Organization, Inc. v Ricoh Corp.*, 487 U.S. 22, 31 (1988)).  "First, the plaintiff's choice of forum merits no weight.  Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted."  *Id.*  Second, a district court may only consider arguments regarding the public interest factors, and must assume that the private interest factors weigh completely in favor of the preselected forum.  *Id.* at 582.  Thus, "a valid forum-selection clause should be given controlling weight in all but the most exceptional cases."  *Id.* at 581 (internal quotation marks omitted).

### i. Counts 1 & 2

In Count 1, Kingsbury seeks a declaratory judgment that it is not responsible for the catastrophic failure of the motor.  In Count 2, Kingsbury brings a breach of contract claim against GE for its failure to pay Kingsbury for shipping costs incurred in connection with shipping the bearings.  Both Counts 1 and 2 involve the contract between GE and Kingsbury for the design, manufacture, and supply of the bearings.

On December 9, 2010, in response to a Request for Tender, Kingsbury sent GE Quotation # E103184-4 ("Quotation") that provided price quotes for development and supply of the

---

[T]he enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases.

*Id.* at 879-80 (citations omitted).

bearings and described plans for their design, manufacture, and testing.  On December 17, 2010, GE sent Purchase Order 42047591 to cover the engineering design work for the top and bottom bearings, and on January 11, 2011, GE sent two additional purchase orders: Purchase Order 190891 for the purchase of the bottom bearing and Purchase Order 190894 for the purchase of the top bearing (collectively, "Purchase Orders").  The Purchase Orders contained a forum selection clause designating England as the exclusive jurisdiction.  The parties debate whether the forum selection clause in the Purchase Orders is part of the contract between them. However, both appear to agree that if the forum selection clause is part of the agreement between the parties then the case should be dismissed under the doctrine of *forum non conveniens*.

Whether the forum selection clause is part of the contract between the parties depends entirely on whether Kingsbury's Quotation or GE's Purchase Orders constituted the offer to contract.  If Kingsbury's Quotation was sufficiently intentional and definite to constitute the offer then the forum selection clause is not part of the contract because it is an additional term in the acceptance (GE's Purchase Orders) that would materially alter the contact.[6]  If Kingsbury's

---

[6] Under section 2207 of Pennsylvania's Uniform Commercial Code ("PA UCC"), 13 Pa. Cons. Stat. Ann. § 2207, an additional term in an acceptance does not become part of the contract if it would materially alter the contract. Section 2207 provides:

 a) General rule.--A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

 (b) Effect on contract.--The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

 (1) the offer expressly limits acceptance to the terms of the offer;

 (2) they materially alter it; or

 (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

 (c) Conduct establishing contract.--Conduct by both parties which recognizes the existence

Quotation, however, was not sufficiently intentional and definite to constitute the offer and GE's Purchase Orders were sufficiently intentional and definite, then GE's Purchase Orders constituted the offer and the forum selection clause is part of the contract.  As explained below, Kingsbury's Quotation was not intentional or definite enough to constitute an offer because it reserved the right to change the prices and lead times, did not contain the liquidated damages provision negotiated by the parties, and promised to produce bearings based on an outdated version of the specifications for the bearings (Version B).  Rather, GE's Purchase Orders constituted the offer because they contained definite prices, a firm shipment date, the liquidated damages provision negotiated by the parties, and referred to production and supply of the newest

---

of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title.

13 Pa. Cons. Stat. Ann. § 2207.

version of the specifications for the bearings (Version C).[7]  Thus, the forum selection clause in

the Purchase Orders is part of the contract because it appears in the offer.

The PA UCC does not define "offer."  However, the Superior Court of Pennsylvania has

defined an offer as "a manifestation of willingness to enter into a bargain, so made as to justify

another person in understanding that his assent to that bargain is invited and will conclude it."

*Cobaugh v. Klick-Lewis, Inc.*, 561 A.2d 1248, 1249 (Pa. Super. Ct. 1989) (citing Restatement

(Second) of Contracts § 24; 8 P.L.E. Contracts § 23).  "It is basic contract law that one cannot

suppose, believe, suspect, imagine or hope that an offer has been made. An offer must be

intentional, definite, in its terms and communicated; otherwise, no meeting of the minds can

occur."  *Stumpp v. Stroudsburg Mun. Auth.*, 658 A.2d 333, 335 (Pa. 1995).  Considerations that

are relevant to the determination of whether an offer is made "'include the terms of any previous

inquiry, the completeness of the terms of the suggested bargain, and the number of persons to

whom a communication is addressed.'"  *Beaver Valley Alloy Foundry, Co. v. Therma-Fab, Inc.*,

---

[7]       On December 9, 2010, Kingsbury sent GE the Quotation.  On December 13, 2010, the parties
negotiated a liquidated damages provision.  On December 14, 2010, GE informed Kingsbury that it was
adopting a new version of the specifications for the bearings (Version C).  On December 17, 2010, GE
sent its first purchase order to cover engineering design work. Technically, GE's December 17, 2010
purchase order did not include any shipment date or liquidated damages provision.  This makes sense,
however, because there was no need to include a shipment date or a liquidated damages provision to
cover the late delivery of goods when the only thing to be produced was design work.  The December 17,
2010 purchase order also did not address whether the design work would be completed according to
Version B or Version C of the specifications for the bearings.  Only three days earlier, on December 14,
2010, however, GE had informed Kingsbury that it was adopting Version C of the specifications.  Thus,
there was no confusion as to which version of the specifications Kingsbury was to produce. Moreover, the
two January 11, 2011 purchase orders that covered the manufacture and supply of the bearings, the core
of the agreement, both referred to production and supply of bearings in accordance with Version C
specifications.  Furthermore, no one disputes that Kingsbury designed, manufactured, and supplied
Version C bearings.
        Like the January 11, 2011 purchase orders, the December 17, 2010 purchase order contained a
definite price and was issued only after the parties negotiated the liquidated damages provision and GE
informed Kingsbury of its decision to adopt a new version of the specifications for the bearings.  For ease
of reference, and because the differences between the December 17, 2010 purchase order and the January
11, 2011 purchase orders do not alter my decision, for the remainder of the memorandum I will refer
collectively to the Purchase Orders without distinction.

814 A.2d 217, 222 (Pa. Super. Ct. 2002) (quoting Restatement (Second) of Contracts, § 26 comment c). "Some cases have construed quotations to be offers while others have determined that a quotation is merely an invitation to offer. The inquiry concerns the nature of the document in the context of the surrounding circumstances." *Id.* (citation omitted).

Factors that weigh in favor of a finding that a quotation is an offer include: (1) the quotation was made in response to a request for a price quote; (2) the quotation contains detailed contract terms; and (3) the quotation is unconditional. *Beaver Valley*, 814 A.2d at 222; *see also Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F. Supp. 2d 643, 651 (E.D. Pa. 2002); *Bergquist Co. v. Sunroc Corp.*, 777 F. Supp. 1236, 1249 (E.D. Pa. 1991). Factors that weigh in favor of a finding that a quotation is not an offer tend to show that the seller did not actually intend to make an offer. Evidence that the seller did not actually intend to make an offer includes: (1) the quotation lacks specificity; (2) the language of the quotation invites further negotiation; (3) the seller reserves the right to change essential terms of the contract or conditions the contract upon its further approval; and (4) further negotiations on essential terms take place after issuance of the quotation. *See Dyno Const. Co. v. McWane, Inc.*, 198 F.3d 567, 573-74 (6th Cir. 1999); *Babcock & Wilcox Co. v. Hitachi America, Ltd.*, 406 F. Supp. 2d 819, 829-30 (N.D. Ohio 2005); *Bergquist*, 777 F. Supp. at 1249; *Beaver Valley*, 814 A.2d at 222.

Kingsbury sent its Quotation in response to GE's Request for Tender that invited Kingsbury, as well as other companies, to submit bids for the design, manufacture, and supply of the bearings. The Quotation provided specific details regarding the design of the bearings, as well as an itemized quote for each bearing, each component related to the bearings, and the engineering design services. The Quotation set forth a "preliminary design & production schedule." Compl. Ex. A. Additionally, at the top of each page, the Quotation stated,

"Kingsbury is pleased to offer the following in reference to your recent inquiry." *Id.* Moreover, the Quotation contained the statement, "These prices & lead times are valid for acceptance for 6 days and are subject to the final design of the brake." *Id.* Kingsbury argues that the specificity of the Quotation and its "pleased to offer" and "valid for acceptance" language indicate that Kingsbury intended the Quotation to be an offer, and that the Quotation was definite enough to signal to GE that its assent would conclude the agreement.[8]

While the language excerpted by Kingsbury from the Quotation contains some indicia that Kingsbury could have intended the Quotation to be an offer, it is by no means a clear indication of intent. Kingsbury never labelled the Quotation an offer; rather, it made the very general statement that it was "pleased to offer the following," a statement capable of more than one interpretation. Kingsbury also concluded the Quotation with the statement, "Please review this at your convenience and let me know if you have any questions." *Id.* A statement that is equally capable of more than one meaning, but that GE argues indicates that Kingsbury did not intend the Quotation to be an offer because it invited further negotiation. Despite vigorous arguments by both sides on the importance of these phrases, they do little to inform the debate as to whether the Quotation was an offer.

---

[8] Kingsbury also argues that GE's Request for Tender proves the Quotation was an offer. Kingsbury notes that the dictionary definition of tender is synonymous with offer. Additionally Kingsbury points out that in its Request for Tender, GE defined the "Contract" as "the contract between the Buyer and Seller consisting of the Purchase Order, any documents referred to in the Purchase Order and these Conditions of Purchase." Def.'s Mot. Ex. 1 ¶ 1. Kingsbury contends that the definition of tender and contract demonstrate that GE's Request for Tender was a request for Kingsbury to make an offer. Even if the Request for Tender was a request for Kingsbury to make an offer, the Request for Tender specifically stated that the seller had to comply with the terms of both the Request for Tender and Coverteam's Conditions of Purchase, which included a liquidated damages provision and a forum selection clause designating England as the exclusive jurisdiction. Kingsbury clearly failed to comply with these terms. Moreover, even if Kingsbury had complied, GE's request for an offer would not automatically make whatever Kingsbury sent to GE an offer. To constitute an offer, the Quotation still had to be "a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Cobaugh*, 561 A.2d at 1249.

Kingsbury also relies on the following statement to support its position that the Quotation was the offer, which, when fully quoted, provides:

> These prices & lead times are valid for acceptance for 6 days and are subject to the final design of the brake. Since the brake is undefined at the time that this proposal was prepared, Kingsbury reserves the right to adjust the pricing and lead time based on the final design configuration of the brake or its interface with the bearing housings.

*Id.* While this statement indicates that the Quotation was valid for acceptance, it also made the Quotation subject to the undefined final design of the brake. More significantly, Kingsbury also stated that it reserved the right to change both the prices and delivery dates pending final design of the brake, a strong indication that it did not intend the Quotation to be an offer. *See Bergquist*, 777 F. Supp. at 1249 (finding that a quotation "'subject to material availability and price in effect at time of shipment' . . . suggests [seller] did not intend to be bound by the terms of the price quotation, but reserved the right to change the price up to the time of shipment.").

Kingsbury argues that even though the price and delivery times were subject to change, the Quotation is still an offer because the PA UCC expressly allows "parties if they so intend to conclude a contract for sale even though the price is not settled," 13 Pa. Cons. Stat. Ann. § 2305(a), or to leave terms open "if the parties intended to make a contract." 13 Pa. Cons. Stat. Ann. § 2204. However, sections 2305 and 2204 of the PA UCC only apply when both parties intend to enter a binding agreement notwithstanding the open terms. *Id.* §§ 2204 cmt. 3, 2305 cmt. 1, 6. Here, there is no indication that both parties intended to enter an agreement with open terms. The Purchase Orders that GE sent to Kingsbury had definite prices, a definite shipment date, and a liquidated damages provision in the event of late delivery, indicating that Kingsbury never intended to reach an agreement with open terms. Kingsbury's reservation of right to change the price and lead times in the Quotation does not prove that the parties intended to enter

an agreement with open terms; rather, it demonstrates that the Quotation was yet another step in the negotiation process that was not intended or perceived to be an offer.

Kingsbury also argues that GE must have viewed the Quotation as an offer because it referred to the Quotation in its Purchase Orders.  For an entire month after Kingsbury sent the Quotation, the parties continued to negotiate essential terms of the agreement.  These further negotiations belie Kingsbury's contention that either party viewed the Quotation as an offer, and bolster GE's position that the Quotation was not an offer.  *See Babcock*, 406 F. Supp. 2d at 829-30 (finding that the parties' further negotiations after the quotation on such issues as liquidated damages and the price of the catalyst indicated that the quotation was not an offer).

On December 13, 2010, the parties sent several emails back and forth discussing the percentage of liquidated damages to include in the agreement.  In GE's Request for Tender it had originally specified liquidated damages at 2% of the contract price per week of delay up to a maximum of 8% of the contract price.  In a statement made prior to December 13, 2010, Kingsbury had agreed to a liquidated damages provision of 0.5% of the contract price per week up to a maximum of 3% of the contract price.  GE reminded Kingsbury of this earlier statement, and countered by requesting a liquidated damages provision of 0.5% up to 5% of the contract price for delay.  Kingsbury responded, "[W]e will agree to 0.5% per week up to a total of 4% of the bearing assembly price if [GE] agrees to the following dates (as shown on the latest revision of the quote.)"  *Id.*  Kingsbury's response demonstrates that Kingsbury did not view its own Quotation as an offer because it believed that both liquidated damages and delivery dates were still bargaining chips to be used in the process of negotiating an agreement.

Most importantly, in the time between when Kingsbury sent its Quotation and GE sent its Purchase Orders, GE changed the specifications for the bearings.  The Quotation described plans

15

for the design, manufacture, and testing of bearings in conformance with Version B of GE's specifications for the bearings. On December 14, 2010, GE informed Kingsbury that it had decided to adopt a new version of the specifications for the bearings, and invited GE to send questions and comments before it approved Version C of the specifications.  On January 10, 2011, Kingsbury responded with a "list of questions, exception and comments," and stated, "I hope this meets with your approval.  However, if there are any questions, please feel free to contact [us] at your convenience."  Def.'s Mot. Ex. 3.  Thus, the parties continued negotiating over the specifications for the bearings—the whole purpose for entering into the agreement—after the Quotation issued.

Unlike Kingsbury's Quotation, the Purchase Orders stated that the bearings would be manufactured, supplied, and tested in accordance with Version C of the specifications.  It is illogical to view GE's Purchase Orders for Version C bearings to be an acceptance of Kingsbury's Quotation to produce Version B bearings given that the goods themselves changed. Recognizing this difficulty, Kingsbury argues that its January 10, 2011 letter discussing the Version C bearings amended its Quotation.  Kingsbury also contends that its December 13, 2010 email agreeing to a liquidated damages provision amended its Quotation.  The problem with this argument is that there is no evidence that Kingsbury intended to amend its Quotation with this letter or email and, more significantly, the Quotation was "expressly limited to and made conditional upon the terms and conditions contained [t]herein."  Compl. Ex. B.

Based on the Quotation itself and the surrounding circumstances, it is evident that Kingsbury's Quotation was not an offer, but rather an invitation to further negotiate.  In contrast to the Quotation, the Purchase Orders contained definite prices, referred to production and supply of Version C bearings, and included a firm shipment date and the liquidated damages

provision negotiated by the parties after issuance of the Quotation.  The Purchase Orders reflected the complete terms negotiated by the parties.  Moreover, no further negotiations appear to have taken place once GE had sent all of the Purchase Orders, and Kingsbury responded to the Purchase Orders with written order acknowledgements.  These Purchase Orders constituted the offers to enter into agreement, and GE's order acknowledgements, as well as its performance, constituted the acceptances.  Because the forum selection clause appears in each of the offers, it is part of the parties' agreement.[9]  Therefore, I will dismiss Counts 1 and 2 of the Complaint under the doctrine of *forum non conveniens* because a valid forum selection clause grants England exclusive jurisdiction.

### ii. Counts 3 and 4

In Counts 3 and 4, Kingsbury alleges that GE breached its contractual agreements to pay Kingsbury for field service and repair work that it requested from Kingsbury in late 2012 and early 2013.  Both parties agree that the contracts at issue in Counts 3 and 4 do not contain a forum selection clause.  GE argues, however, that these counts should be dismissed under the doctrine of *forum non conveniens* based on the forum selection clause in the Purchase Orders that govern the contract for the design, manufacture, and supply of the bearings because the field service and repair work "was incurred as a result of Kingsbury's failure to meet the specifications" for the bearings.  Def.'s Mot. 8.  Kingsbury points out that it performed the field service and repair work under "separate contracts supported by separate consideration," and that there is no legal basis to impute a forum selection clause from a different agreement to these contracts.  Pl.'s Resp. 24.  Indeed, GE provides no legal support for its argument.  Therefore,

---

[9]  Kingsbury argues that even if GE's Purchase Orders were the offers, GE's forum selection clause is unenforceable, pursuant to PA UCC § 2207(c), because Kingsbury accepted those offers by performance and the parties exchanged no writings that agreed on a forum selection clause.  Kingsbury, however, contradicts its own argument by pointing out that it sent a written order acknowledgment for each purchase order.  *See* Pl.'s Resp. 7-8.

there is no legal basis upon which to conclude that a forum selection clause applies to these repair contracts.

In the absence of a forum selection clause, the moving party bears the burden of establishing that the doctrine of *forum non conveniens* applies. *See Jumara*, 55 F.3d 873, 879 (3d Cir. 1995). Moreover, a district court considering a *forum non conveniens* motion must evaluate both the private and public interest factors, *Jumara*, 55 F.3d at 581, and give "paramount consideration" to the plaintiff's choice of forum. *Shutte*, 431 F.2d at 25. In the absence of a forum selection clause, a court should be cautious in dismissing a case under the doctrine of *forum non conveniens*. *Atl. Marine*, 134 S. Ct. at 583 n.8. Dismissal is "the harsh result of that doctrine: . . . [it] inconveniences plaintiffs in several respects and even makes it possible for plaintiffs to lose out completely, through the running of the statute of limitations in the forum finally deemed appropriate." *Id.* (internal quotation marks omitted).

GE does not address why any of the private or public factors necessitate dismissal under the doctrine of *forum non conveniens*. Rather, it focuses entirely on the doomed argument that a forum selection clause from another agreement somehow applies. GE provides no basis to support the harsh result of dismissal that it advocates. I will deny GE's motion to dismiss Counts 3 and 4 of the Complaint under the doctrine of *forum non conveniens* because there is no reason to disturb Kingsbury's choice of forum.

**B. Count 5 of the Complaint**

In Count 5 of the Complaint, Kingsbury alleges that GE breached its contractual agreement to pay Kingsbury $130,000 for the reassembly of the bearings. GE argues that the Court should stay and compel arbitration of Count 5 because the contract contains an arbitration clause that requires the parties to submit this claim to arbitration before the International

Chamber of Commerce ("ICC").[10]  Kingsbury opposes the motion to stay and compel arbitration of Count 5 based on its contention that the contract does not contain an arbitration clause.

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"), "creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir. 2009).  "Congress designed the FAA to overrule the judiciary's longstanding reluctance to enforce agreements to arbitrate and its refusal to put such agreements on the same footing as other contracts, and in the FAA expressed a strong federal policy in favor of resolving disputes through arbitration." *Id.* (citations omitted).  "In particular, the FAA provides that as a matter of federal law '[a] written provision' in a maritime or commercial contract showing an agreement to settle disputes by arbitration 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or in equity for the revocation of any contract.'"  *Id.* (quoting 9 U.S.C. § 2).

The second chapter of the FAA, 9 U.S.C. §§ 201-208, implements the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention").  "Pursuant to this chapter, arbitration agreements fall within the New York Convention if they arise from commercial, legal relationships, such as commercial contracts, except when those relationships are entirely between United States citizens and otherwise are domestic in nature." *Id.* (citing 9 U.S.C. § 202).  Actions covered by the New York Convention are regarded as arising under the laws and treaties of the United States. *Century*, 584 F.3d at 523; 9 U.S.C. § 203.  Under the New York Convention, a court "may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States."  9 U.S.C. § 206.  "The strong federal policy favoring

---

[10]  GE moves to stay and compel arbitration of Count 5 pursuant to 9 U.S.C. §§ 3, 4, & 201 *et seq.*

arbitration applies with special force in the field of international commerce." *Century*, 584 F.3d at 523.

"The strong federal policy favoring arbitration, however, does not lead automatically to the submission of a dispute to arbitration upon the demand of a party to the dispute." *Id.* "Because arbitration is a matter of contract, before compelling arbitration pursuant to the Federal Arbitration Act, a court must determine that (1) an enforceable agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir.2009) (citation omitted).  Moreover, the "presumption in favor of arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Id.* (internal quotation marks omitted).

Both parties agree that the New York Convention applies and that this Court has the power to compel arbitration before the ICC.  They dispute whether the contract for the reassembly of the bearings included the arbitration clause set forth in the August 20, 2013 purchase order.[11]  Thus, Kingsbury argues that no enforceable agreement to arbitrate exists because the arbitration clause is not part of the agreement.

On August 20, 2013, GE sent Kingsbury Purchase Order 44033885 for $130,000, requesting that Kingsbury perform labor to reassemble the bearings.  In the purchase order, GE explained to Kingsbury:

> The price is based on your letter dated 14th August 2013 confirmed on your email dated 19th August 2013 of which the following is an extract[:]
>> ["]Our previous cost estimate can be considered the Fixed Price cost for the Kingsbury scope of work.  Or summary assessment for the reassembly work is 160 hours.["]

---

[11]  Both parties agree that if the arbitration clause is part of the contract, Count 5 falls within its scope.

*Id.* Ex. L.  The August 20, 2013 purchase order also stated: "GE ENERGY STANDARD

EUROPE TERMS OF PURCHASE REV. H (REVISED FEBRUARY 1, 2011) APPLY TO

THIS ORDER."  *Id.*  The GE Energy Europe Terms of Purchase Rev. H provide:

> **DISPUTE RESOLUTION.**  In the event of any dispute arising out of or in
> connection with this Order, the parties agree to submit such dispute to settlement
> proceedings under the Alternative Dispute Resolution Rules (the "ADR Rules")
> of the International Chamber of Commerce ("ICC").  If the dispute has not been
> settled pursuant to the ADR Rules within forty-five (45) days following the filing
> of a request for ADR or within such other period as the parties may agree in
> writing, such dispute shall be finally settled under the Rules of Arbitration and
> Conciliation of the ICC (the "ICC Rules") by one or more arbitrators appointed in
> accordance with such ICC Rules.  The place of arbitration shall be London,
> England and proceedings shall be conducted in the English language, unless
> otherwise stated on the face of this Order.  The award shall be final and binding
> on both Buyer and Seller, and the parties hereby waive the right of appeal to any
> court for amendment or modification of the arbitrators' award.

Def.'s Mot. Ex. 4.  On September 27, 2013, Kingsbury sent an invoice to GE for $130,000 for

the work outlined in the August 20, 2013 purchase order.

        Similar to Counts 1 and 2, the parties again dispute which documents constituted the

offer.  GE argues that the August 20, 2013 purchase order constituted the offer and Kingsbury's

invoice constituted the acceptance; therefore, the arbitration clause is part of the contract.

Kingsbury contends that the August 14, 2013 letter and August 19, 2013 email ("August Letter

and Email") that are referred to in GE's August 20, 2013 purchase order, but have not been

produced to the Court and are not mentioned in the Complaint, constituted the offer and the

arbitration clause is not part of the contract because it is an additional term in the acceptance

(GE's purchase order) that would materially alter the contract.[12]

---

[12] Under section 2207 of Pennsylvania's Uniform Commercial Code ("PA UCC"), 13 Pa. Cons. Stat. Ann.
§ 2207, an additional term in an acceptance does not become part of the contract if it would materially
alter the contract.  The parties debate whether the PA UCC applies to this agreement because it is not a
contract for the sale of goods.  Additionally, even if it does apply, an arbitration clause may not
automatically constitute a material alteration.  *See Standard Bent Glass Corp. v. Glassrobots OY*, 333
F.3d 440, 448 n.12 (3d Cir. 2003).  Because I conclude that the August email and letter were not an offer,
I need not resolve these issues.

"It is basic contract law that one cannot suppose, believe, suspect, imagine or hope that an offer has been made. An offer must be intentional, definite, in its terms and communicated; otherwise, no meeting of the minds can occur." *Stumpp*, 658 A.2d at 335.  The only evidence regarding the contents of Kingsbury's August Letter and Email are the two lines GE quotes in its August 20, 2013 purchase order.  These two lines do not establish that Kingsbury's letter and email were communications to GE of its intention to be bound that contained sufficiently definite terms.  Kingsbury's August Letter and Email were not an offer.  Rather, GE's August 20, 2013 purchase order constituted the offer that Kingsbury accepted with the invoice it sent to GE.  An enforceable agreement to arbitrate exists because GE's August 20, 2013 purchase order incorporated the arbitration clause.  There is no dispute that this breach of contract claim falls within the scope of the arbitration clause.  Therefore, I will grant GE's motion to stay and compel arbitration of Count 5.

## III.  CONCLUSION

For the reasons set forth above, I will grant GE's motion to dismiss Counts 1 and 2, and I will deny GE's motion to dismiss Counts 3 and 4.  Additionally, I will grant GE's motion to stay and compel arbitration of Count 5.

S/ANITA B. BRODY

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                                     Copies

**MAILED** on _____ to:

O:\ABB 2014\A - K\Kingsbury v. GE Motion to Dismiss and Stay Memorandum.docx